## *PRELIMINARY PRINT*

## VOLUME 604 U. S. PART 1
### PAGES 56–85

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JANUARY 17, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published.   Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# TIKTOK INC. ET AL. *v.* GARLAND, ATTORNEY GENERAL

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 24–656.    Argued January 10, 2025—Decided January 17, 2025*

TikTok is a social media platform with more than 170 million U. S. users. While TikTok Inc. operates the platform in the United States, its ultimate parent company is ByteDance Ltd., a privately held company with operations in China.   ByteDance Ltd. owns, develops, and maintains the proprietary algorithm TikTok uses to generate a personalized content feed for each TikTok user.   Under Chinese law, ByteDance Ltd. is required to "assist or cooperate" with the Chinese Government's "intelligence work," and the Chinese Government has "the power to access and control private data" the company holds.   H. R. Rep. No. 118–417, p. 4 (2024).

   Government officials in the United States have taken repeated actions to address national security concerns regarding the relationship between China and TikTok.   Against that backdrop, Congress enacted—with broad bipartisan support—the Protecting Americans from Foreign Adversary Controlled Applications Act, 138 Stat. 955.   The Act makes it unlawful for any entity to provide certain services to "distribute, maintain, or update" a "foreign adversary controlled application" in the United States.   § 2(a)(1).   Such applications expressly include any application that is "operated, directly or indirectly," by "ByteDance Ltd." or "TikTok."   § 2(g)(3)(A).   The Act's prohibitions as to those applications are effective beginning January 19, 2025.   See § 2(a)(2).   The Act provides, however, that TikTok can avoid the Act's prohibitions by undergoing a "qualified divestiture"—one the President determines will result, among other things, in the application "no longer being controlled by a foreign adversary."   § 2(g)(6)(A).

   ByteDance Ltd. and TikTok Inc.—along with two sets of TikTok users and creators (creator petitioners)—filed petitions for review in the D. C. Circuit, challenging the constitutionality of the Act.   As relevant here, petitioners argued that the Act's prohibitions, TikTok-specific foreign adversary controlled application designation, and divestiture re-

--------

*Together with No. 24–657, *Firebaugh et al.* v. *Garland, Attorney General*, also on certiorari to the same court.

quirement violate the First Amendment. The D. C. Circuit denied the petitions, holding that the Act does not violate petitioners' First Amendment rights. The Court granted certiorari to consider petitioners' First Amendment challenges on an expedited basis.

*Held*: The challenged provisions do not violate petitioners' First Amendment rights. Pp. 67–80.

(a) The Court first considers whether the challenged provisions are subject to First Amendment scrutiny. Laws that directly regulate expressive conduct can, but do not necessarily, trigger such review. See *R. A. V.* v. *St. Paul*, 505 U. S. 377, 382–386. The Court has also applied First Amendment scrutiny in "cases involving governmental regulation of conduct that has an expressive element," and to "some statutes which, although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities." *Arcara* v. *Cloud Books, Inc.*, 478 U. S. 697, 703–704.

The Court assumes without deciding that the challenged provisions are subject to First Amendment scrutiny. It is not clear whether the Act directly regulates protected expressive activity, or conduct with an expressive component. Indeed, the Act directly regulates ByteDance and TikTok only through the divestiture requirement, and it does not regulate the creator petitioners at all. In any event, petitioners' arguments more closely approximate a claim that the challenged provisions, which in effect will ban TikTok in the United States, disproportionately burden petitioners' First Amendment activities. The Court has not previously articulated a clear framework for determining whether a regulation of non-expressive activity that disproportionately burdens those engaged in expressive activity triggers heightened review, and does not do so in these cases. The Court instead assumes without deciding that the challenged provisions fall within this category. Pp. 67–69.

(b) The challenged provisions trigger only intermediate scrutiny. Pp. 70–73.

(1) "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed* v. *Town of Gilbert*, 576 U. S. 155, 163. Content-neutral laws, in contrast, are subject only to intermediate scrutiny because they generally "pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 642. Under that standard, the Court will sustain a content-neutral law "if it advances

Page Proof Pending Publication

important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broadcasting System, Inc.* v. *FCC*, 520 U. S. 180, 189.

The Court has identified two forms of content-based speech regulation. First, a law is content based on its face if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U. S., at 163. Second, a facially content-neutral law is nonetheless treated as a content-based regulation of speech if it "cannot be justified without reference to the content of the regulated speech" or was "adopted by the government because of disagreement with the message the speech conveys." *Id.*, at 164 (internal quotation marks omitted). Pp. 70–71.

(2) The challenged provisions are facially content neutral. They impose TikTok-specific prohibitions due to a foreign adversary's control over the platform and make divestiture a prerequisite for the platform's continued operation in the United States. They do not target speech based upon its content, or regulate speech based on its function or purpose. Nor do they impose a content-based restriction, penalty, or burden.

Petitioners argue that the Act is content based on its face because it excludes from the definition of "covered company" any company that operates an application "whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews." § 2(g)(2)(B). But that exclusion does not apply to the Act's specific designation of TikTok as a covered application. §§ 2(g)(3)(A)–(B). As such, the exclusion is not within the scope of petitioners' as-applied challenge. Pp. 71–72.

(3) The Government also supports the challenged provisions with a content-neutral justification: preventing China from collecting sensitive data from 170 million U. S. TikTok users. That data collection justification neither references the content of speech on TikTok nor reflects disagreement with the message such speech conveys. Because the justification reflects a "purpos[e] unrelated to the content of expression," it is content neutral. *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791. P. 72.

(4) The Act's TikTok-specific distinctions, moreover, do not trigger strict scrutiny. While "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference," *Turner Broadcasting System, Inc.*, 512 U. S., at 658, such scrutiny "is unwarranted when the differential treatment is 'justified by some special characteristic of' the particular [speaker] being

Syllabus

regulated," *id.*, at 660–661 (quoting *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 585). Here, the challenged provisions regulate TikTok based on a content-neutral data collection interest. And TikTok has special characteristics—a foreign adversary's ability to leverage its control over the platform to collect vast amounts of personal data from 170 million U. S. users—that justify differential treatment. Pp. 72–73.

(c) As applied to petitioners, the Act satisfies intermediate scrutiny. Pp. 73–78.

(1) The challenged provisions further an important Government interest unrelated to the suppression of free expression. The Act's prohibitions and divestiture requirement are designed to prevent China—a designated foreign adversary—from leveraging its control over Byte-Dance Ltd. to capture the personal data of U. S. TikTok users. This objective qualifies as an important Government interest under intermediate scrutiny. TikTok collects extensive personal information from and about its users. Access to such detailed information about U. S. users, the Government worries, could enable China to track the locations of federal workers, build dossiers for blackmail, and conduct corporate espionage. Rather than meaningfully dispute the scope of the data TikTok collects or the ends to which it may be used, petitioners argue that it is unlikely that China would compel TikTok to turn over user data for intelligence purposes. The Court, however, affords the Government's informed judgment substantial respect in the national security and foreign policy contexts. And the Government's determination that China might leverage its relationship with ByteDance Ltd. to access U. S. TikTok users' data is at least a reasonable inference based on substantial evidence. The Court also rejects petitioners' argument that the Act is underinclusive as to the Government's data protection rationale. On this record, Congress was justified in specifically addressing its TikTok-related national security concerns. Pp. 73–76.

(2) As applied to petitioners, the Act is sufficiently tailored to address the Government's data collection interest. Intermediate scrutiny is satisfied if the challenged regulation " 'promotes a substantial government interest that would be achieved less effectively absent the regulation' " and does not "burden substantially more speech than is necessary." *Ward*, 491 U. S., at 799 (quoting *United States* v. *Albertini*, 472 U. S. 675, 689; alterations omitted). That standard is met here. The prohibitions account for the fact that, absent a qualified divestiture, TikTok's very operation implicates the Government's data collection concerns, while the requirements that make a divestiture "qualified" ensure that those concerns are addressed before TikTok resumes U. S. opera-

tions. While petitioners offer a series of preferred alternatives that they assert would equally address the Government's data collection interest, those alternatives ignore the latitude the Court affords the Government to design regulatory solutions to address content-neutral interests. The Court will not override the Government's judgment respecting content-neutral regulations so long as the Government's policy is "grounded on reasonable factual findings supported by evidence that is substantial for a legislative determination." *Turner Broadcasting System, Inc.*, 520 U. S., at 224. Those requirements are met here. Pp. 76–78.

(d) Beyond data collection concerns, the Government asserts an interest in preventing a foreign adversary from controlling the recommendation algorithm that runs a widely used U. S. communications platform and from wielding that control to alter the content on the platform in an undetectable manner. In petitioners' view, that rationale is a content-based justification that triggers strict scrutiny. Petitioners have not pointed to any cases in which the Court has assessed the appropriate level of First Amendment scrutiny for an Act of Congress justified on both content-neutral and content-based grounds. They assert, however, that the challenged provisions are subject to—and fail—strict scrutiny because Congress would not have passed the provisions absent the foreign adversary control rationale. The Court does not determine the proper standard here. Even assuming the Government has offered a content-based justification for the challenged provisions, petitioners' argument fails under the standard they propose: The record before the Court adequately supports the conclusion that Congress would have passed the challenged provisions based on the data collection justification alone. Pp. 78–80.

122 F. 4th 930, affirmed.

*Noel J. Francisco* argued the cause for petitioners TikTok Inc. et al. With him on the brief were *Hashim M. Mooppan, Kelly Holt Rodriguez, Andrew J. Pincus, Avi M. Kupfer, Alexander A. Berengaut, David M. Zionts, Megan A. Crowley,* and *John E. Hall.*

*Jeffrey L. Fisher* argued the cause for petitioners Firebaugh et al. With him on the brief were *Joshua Revesz, Jacob Huebert, Jeffrey M. Schwab, Ambika Kumar, Adam S. Sieff, James R. Sigel,* and *Elizabeth A. McNamara.*

*Solicitor General Prelogar* argued the cause for respondent in both cases. With her on the brief were *Principal*

Counsel

*Deputy Assistant Attorney General Boynton, Deputy Solicitor General Kneedler, Sopan Joshi, Mark R. Freeman, Sharon Swingle, Daniel Tenny, Casen B. Ross, Sean R. Janda,* and *Brian J. Springer.*†

———

†Briefs of *amici curiae* urging reversal in both cases were filed for the Knight First Amendment Institute at Columbia University et al. by *Jameel Jaffer, Ramya Krishnan,* and *Alex Abdo*; for Members of Congress by *Theodore J. Boutrous, Jr., Nicola T. Hanna, Patrick J. Fuster, Thomas M. Donovan, Blaine H. Evanson,* and *Christine A. Budasoff*; for Social and Racial Justice Nonprofits by *Travis LeBlanc, Matt K. Nguyen, Kathleen R. Hartnett,* and *Jamie D. Robertson*; and for Susan A. Aaronson et al. by *Mark S. Davies.*

Briefs of *amici curiae* urging reversal in No. 24–656 were filed for First Amendment and Internet Law Professors by *Michael Gottlieb*; and for the Foundation for Individual Rights and Expression et al. by *Robert Corn-Revere.*

Briefs of *amici curiae* urging affirmance in both cases were filed for the State of Montana et al. by *Austin Knudsen,* Attorney General of Montana, *Christian B. Corrigan,* Solicitor General, *Peter M. Torstensen, Jr.,* Deputy Solicitor General, by *Jason S. Miyares,* Attorney General of Virginia, *Erika L. Maley,* Solicitor General, *Kevin M. Gallagher,* Principal Deputy Solicitor General, and *Michael Dingman,* Assistant Solicitor General, and by the Attorneys General for their respective States as follows: *Steve Marshall* of Alabama, *Tim Griffin* of Arkansas, *Ashley Moody* of Florida, *Christopher M. Carr* of Georgia, *Raúl R. Labrador* of Idaho, *Theodore E. Rokita* of Indiana, *Brenna Bird* of Iowa, *Russell Coleman* of Kentucky, *Liz Murrill* of Louisiana, *Lynn Fitch* of Mississippi, *Andrew Bailey* of Missouri, *Michael T. Hilgers* of Nebraska, *John M. Formella* of New Hampshire, *Drew Wrigley* of North Dakota, *Dave Yost* of Ohio, *Gentner F. Drummond* of Oklahoma, *Alan Wilson* of South Carolina, *Marty J. Jackley* of South Dakota, *Jonathan Skrmetti* of Tennessee, and *Sean D. Reyes* of Utah; for the American Free Enterprise Chamber of Commerce by *Jonathan Berry* and *William P. Barr*; for Former Federal Communications Commission Officials et al. by *Thomas M. Johnson, Jr.,* and *Jeremy J. Broggi*; for Former National Security Officials by *Thomas R. McCarthy* and *Kathleen S. Lane*; for the Foundation for Defense of Democracies by *Peter C. Choharis* and *Arnon D. Siegel*; and for John R. Moolenaar et al. by *Thomas M. Johnson, Jr.,* and *Jeremy J. Broggi.*

Briefs of *amici curiae* were filed in both cases for Advancing American Freedom, Inc., et al. by *J. Marc Wheat*; for the American Civil Liberties Union et al. by *Patrick Toomey, Ashley Gorski, Vera Eidelman,*

PER CURIAM.

As of January 19, the Protecting Americans from Foreign Adversary Controlled Applications Act will make it unlawful for companies in the United States to provide services to distribute, maintain, or update the social media platform Tik-Tok, unless U. S. operation of the platform is severed from Chinese control. Petitioners are two TikTok operating entities and a group of U. S. TikTok users. We consider whether the Act, as applied to petitioners, violates the First Amendment.

In doing so, we are conscious that the cases before us involve new technologies with transformative capabilities. This challenging new context counsels caution on our part. As Justice Frankfurter advised 80 years ago in considering the application of established legal rules to the "totally new problems" raised by the airplane and radio, we should take care not to "embarrass the future." *Northwest Airlines, Inc.* v. *Minnesota,* 322 U. S. 292, 300 (1944). That caution is heightened in these cases, given the expedited time allowed for our consideration.[1] Our analysis must be understood to be narrowly focused in light of these circumstances.

*Hina Shamsi, Cecillia D. Wang,* and *David Greene*; for Asian Americans Advancing Justice | AAJC et al. by *Brendan Benedict* and *Noah B. Baron*; for the Campaign for Uyghurs et al. by *Joel L. Thayer*; for the Cato Institute by *Thomas A. Berry*; for Floor64, Inc., by *Catherine R. Gellis*; for the Forum for Constitutional Rights by *Mahesha P. Subbaraman*; for Milton Mueller by *Anne M. Voigts*; for Zephyr Teachout et al. by *Joel L. Thayer, pro se*; and for President Donald J. Trump by *D. John Sauer.*

A brief of *amicus curiae* was filed in No. 24–656 for *Chris Santospirito* et al., *pro se.*

[1] Applications for an injunction pending review were filed on December 16, 2024; we construed the applications as petitions for a writ of certiorari and granted them on December 18, 2024; and oral argument was held on January 10, 2025.

## I

### A

TikTok is a social media platform that allows users to create, publish, view, share, and interact with short videos overlaid with audio and text. Since its launch in 2017, the platform has accumulated over 170 million users in the United States and more than one billion worldwide. Those users are prolific content creators and viewers. In 2023, U. S. TikTok users uploaded more than 5.5 billion videos, which were in turn viewed more than 13 trillion times around the world.

Opening the TikTok application brings a user to the "For You" page—a personalized content feed tailored to the user's interests. TikTok generates the feed using a proprietary algorithm that recommends videos to a user based on the user's interactions with the platform. Each interaction a user has on TikTok—watching a video, following an account, leaving a comment—enables the recommendation system to further tailor a personalized content feed.

A TikTok user's content feed is also shaped by content moderation and filtering decisions. TikTok uses automated and human processes to remove content that violates the platform's community guidelines. See 1 App. 493–497. TikTok also promotes or demotes certain content to advance its business objectives and other goals. See *id.*, at 499–501.

TikTok is operated in the United States by TikTok Inc., an American company incorporated and headquartered in California. TikTok Inc.'s ultimate parent company is ByteDance Ltd., a privately held company that has operations in China. ByteDance Ltd. owns TikTok's proprietary algorithm, which is developed and maintained in China. The company is also responsible for developing portions of the source code that runs the TikTok platform. ByteDance Ltd. is subject to Chinese laws that require it to "assist or cooperate" with the Chinese Government's "intelligence

work" and to ensure that the Chinese Government has "the power to access and control private data" the company holds. H. R. Rep. No. 118–417, p. 4 (2024) (H. R. Rep.); see 2 App. 673–676.

### B

### 1

In recent years, U. S. Government officials have taken repeated actions to address national security concerns regarding the relationship between China and TikTok.

In August 2020, President Trump issued an Executive Order finding that "the spread in the United States of mobile applications developed and owned by companies in [China] continues to threaten the national security, foreign policy, and economy of the United States." Exec. Order No. 13942, 3 CFR 412 (2021). President Trump determined that TikTok raised particular concerns, noting that the platform "automatically captures vast swaths of information from its users" and is susceptible to being used to further the interests of the Chinese Government. *Ibid.* The President invoked his authority under the International Emergency Economic Powers Act (IEEPA), 50 U. S. C. § 1701 *et seq.*, and the National Emergencies Act, 50 U. S. C. § 1601 *et seq.*, to prohibit certain "transactions" involving ByteDance Ltd. or its subsidiaries, as identified by the Secretary of Commerce. 3 CFR 413. The Secretary published a list of prohibited transactions in September 2020. See 85 Fed. Reg. 60061. But federal courts enjoined the prohibitions before they took effect, finding that they exceeded the Executive Branch's authority under IEEPA. See generally *TikTok Inc.* v. *Trump*, 507 F. Supp. 3d 92 (DC 2020); *Marland* v. *Trump*, 498 F. Supp. 3d 624 (ED Pa. 2020).

Just days after issuing his initial Executive Order, President Trump ordered ByteDance Ltd. to divest all interests and rights in any property "used to enable or support ByteDance's operation of the TikTok application in the

Per Curiam

United States," along with "any data obtained or derived from" U. S. TikTok users. 85 Fed. Reg. 51297. ByteDance Ltd. and TikTok Inc. filed suit in the D. C. Circuit, challenging the constitutionality of the order. In February 2021, the D. C. Circuit placed the case in abeyance to permit the Biden administration to review the matter and to enable the parties to negotiate a non-divestiture remedy that would address the Government's national security concerns. See Order in *Tik-Tok Inc.* v. *Committee on Foreign Investment*, No. 20–1444 (CADC, Feb. 19, 2021).

Throughout 2021 and 2022, ByteDance Ltd. negotiated with Executive Branch officials to develop a national security agreement that would resolve those concerns. Executive Branch officials ultimately determined, however, that Byte-Dance Ltd.'s proposed agreement did not adequately "mitigate the risks posed to U. S. national security interests." 2 App. 686. Negotiations stalled, and the parties never finalized an agreement.[2]

Against this backdrop, Congress enacted the Protecting Americans from Foreign Adversary Controlled Applications Act. Pub. L. 118–50, div. H, 138 Stat. 955. The Act makes it unlawful for any entity to provide certain services to "distribute, maintain, or update" a "foreign adversary controlled application" in the United States. § 2(a)(1). Entities that violate this prohibition are subject to civil enforcement actions and hefty monetary penalties. See §§ 2(d)(1)(A), (d)(2)(B).

The Act provides two means by which an application may be designated a "foreign adversary controlled application." First, the Act expressly designates any application that is "operated, directly or indirectly," by "ByteDance Ltd." or "TikTok," or any subsidiary or successor thereof. § 2(g)(3)(A). Second, the Act establishes a general designation framework for any application that is both (1) operated

by a "covered company" that is "controlled by a foreign adversary," and (2) "determined by the President to present a significant threat to the national security of the United States," following a public notice and reporting process. §2(g)(3)(B). In broad terms, the Act defines "covered company" to include a company that operates an application that enables users to generate, share, and view content and has more than 1,000,000 monthly active users. §2(g)(2)(A). The Act excludes from that definition a company that operates an application "whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews." §2(g)(2)(B).

The Act's prohibitions take effect 270 days after an application is designated a foreign adversary controlled application. §2(a)(2). Because the Act itself designates applications operated by "ByteDance, Ltd." and "TikTok," prohibitions as to those applications take effect 270 days after the Act's enactment—January 19, 2025.

The Act exempts a foreign adversary controlled application from the prohibitions if the application undergoes a "qualified divestiture." §2(c)(1). A "qualified divestiture" is one that the President determines will result in the application "no longer being controlled by a foreign adversary." §2(g)(6)(A). The President must further determine that the divestiture "precludes the establishment or maintenance of any operational relationship between the United States operations of the [application] and any formerly affiliated entities that are controlled by a foreign adversary, including any cooperation with respect to the operation of a content recommendation algorithm or an agreement with respect to data sharing." §2(g)(6)(B). The Act permits the President to grant a one-time extension of no more than 90 days with respect to the prohibitions' 270-day effective date if the President makes certain certifications to Congress regarding progress toward a qualified divestiture. §2(a)(3).

Per Curiam

C

ByteDance Ltd. and TikTok Inc.—along with two sets of TikTok users and creators (creator petitioners)—filed petitions for review in the D. C. Circuit, challenging the constitutionality of the Act. As relevant here, petitioners argued that the Act's prohibitions, TikTok-specific foreign adversary controlled application designation, and divestiture requirement violate the First Amendment.

The D. C. Circuit consolidated and denied the petitions, holding that the Act does not violate petitioners' First Amendment rights. 122 F. 4th 930, 940, 948–965 (CADC 2024). After first concluding that the Act was subject to heightened scrutiny under the First Amendment, the court assumed without deciding that strict, rather than intermediate, scrutiny applied. *Id.*, at 948–952. The court held that the Act satisfied that standard, finding that the Government's national security justifications—countering China's data collection and covert content manipulation efforts—were compelling, and that the Act was narrowly tailored to further those interests. *Id.*, at 952–965.

Chief Judge Srinivasan concurred in part and in the judgment. *Id.*, at 970. In his view, the Act was subject to intermediate scrutiny, *id.*, at 974–979, and was constitutional under that standard, *id.*, at 979–983.

We granted certiorari to decide whether the Act, as applied to petitioners, violates the First Amendment. 604 U. S. 1071 (2024).

II

A

At the threshold, we consider whether the challenged provisions are subject to First Amendment scrutiny. Laws that directly regulate expressive conduct can, but do not necessarily, trigger such review. See *R. A. V.* v. *St. Paul*, 505 U. S. 377, 382–386 (1992). We have also applied First

Amendment scrutiny in "cases involving governmental regulation of conduct that has an expressive element," and to "some statutes which, although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities." *Arcara* v. *Cloud Books, Inc.*, 478 U. S. 697, 703–704 (1986).

It is not clear that the Act itself directly regulates protected expressive activity, or conduct with an expressive component. Indeed, the Act does not regulate the creator petitioners at all. And it directly regulates ByteDance Ltd. and TikTok Inc. only through the divestiture requirement. See § 2(c)(1). Petitioners, for their part, have not identified any case in which this Court has treated a regulation of corporate control as a *direct* regulation of expressive activity or semi-expressive conduct. See Tr. of Oral Arg. 37–40. We hesitate to break that new ground in this unique case.

In any event, petitioners' arguments more closely approximate a claim that the Act's prohibitions, TikTok-specific designation, and divestiture requirement "impose a disproportionate burden upon" their First Amendment activities. *Arcara*, 478 U. S., at 704. Petitioners assert—and the Government does not contest—that, because it is commercially infeasible for TikTok to be divested within the Act's 270-day timeframe, the Act effectively bans TikTok in the United States. Petitioners argue that such a ban will burden various First Amendment activities, including content moderation, content generation, access to a distinct medium for expression, association with another speaker or preferred editor, and receipt of information and ideas.

We have recognized a number of these asserted First Amendment interests. See *Moody* v. *NetChoice, LLC*, 603 U. S. 707, 731 (2024) ("An entity 'exercising editorial discretion in the selection and presentation' of content is 'engaged in speech activity.'" (quoting *Arkansas Ed. Television*

Per Curiam

*Comm'n* v. *Forbes*, 523 U. S. 666, 674 (1998); alterations omitted)); *City of Ladue* v. *Gilleo*, 512 U. S. 43, 54–58 (1994) ("Our prior decisions have voiced particular concern with laws that foreclose an entire medium of expression."); *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 68 (2006) ("We have recognized a First Amendment right to associate for the purpose of speaking, which we have termed a 'right of expressive association.'"); *Martin* v. *City of Struthers*, 319 U. S. 141, 143 (1943) ("The right of freedom of speech and press . . . embraces the right to distribute literature and necessarily protects the right to receive it." (citation omitted)).[2]  And an effective ban on a social media platform with 170 million U. S. users certainly burdens those users' expressive activity in a non-trivial way.

At the same time, a law targeting a foreign adversary's control over a communications platform is in many ways different in kind from the regulations of non-expressive activity that we have subjected to First Amendment scrutiny. Those differences—the Act's focus on a foreign government, the congressionally determined adversary relationship between that foreign government and the United States, and the causal steps between the regulations and the alleged burden on protected speech—may impact whether First Amendment scrutiny applies.

This Court has not articulated a clear framework for determining whether a regulation of non-expressive activity that disproportionately burdens those engaged in expressive activity triggers heightened review.  We need not do so here.  We assume without deciding that the challenged provisions fall within this category and are subject to First Amendment scrutiny.

---

[2] To the extent that ByteDance Ltd.'s asserted expressive activity occurs abroad, that activity is not protected by the First Amendment.  See *Agency for Int'l Development* v. *Alliance for Open Society Int'l Inc.*, 591 U. S. 430, 436 (2020) ("[F]oreign organizations operating abroad have no First Amendment rights.").

B

1

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 641 (1994) (*Turner I*). Government action that suppresses speech because of its message "contravenes this essential right." *Ibid.* "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed* v. *Town of Gilbert*, 576 U. S. 155, 163 (2015). Content-neutral laws, in contrast, "are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner I*, 512 U. S., at 642 (citation omitted). Under that standard, we will sustain a content-neutral law "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broadcasting System, Inc.* v. *FCC*, 520 U. S. 180, 189 (1997) (*Turner II*).

We have identified two forms of content-based speech regulation. First, a law is content based on its face if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U. S., at 163; see *id.*, at 163–164 (explaining that some facial distinctions define regulated speech by subject matter, others by the speech's function or purpose). Second, a facially content-neutral law is nonetheless treated as a content-based regulation of speech if it "cannot be 'justified without reference to the content of the regulated speech'" or was "adopted by the government 'because of disagreement with the message the

Per Curiam

speech conveys.'"  *Id.*, at 164 (quoting *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989)).

As applied to petitioners, the challenged provisions are facially content neutral and are justified by a content-neutral rationale.

a

The challenged provisions are facially content neutral. They impose TikTok-specific prohibitions due to a foreign adversary's control over the platform and make divestiture a prerequisite for the platform's continued operation in the United States.  They do not target particular speech based upon its content, contrast, *e. g.*, *Carey* v. *Brown*, 447 U. S. 455, 465 (1980) (statute prohibiting all residential picketing except "peaceful labor picketing"), or regulate speech based on its function or purpose, contrast, *e. g.*, *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 7, 27 (2010) (law prohibiting providing material support to terrorists).  Nor do they impose a "restriction, penalty, or burden" by reason of content on TikTok—a conclusion confirmed by the fact that petitioners "cannot avoid or mitigate" the effects of the Act by altering their speech.  *Turner I*, 512 U. S., at 644.  As to petitioners, the Act thus does not facially regulate "particular speech because of the topic discussed or the idea or message expressed."  *Reed*, 576 U. S., at 163.

Petitioners argue that the Act is content based on its face because it excludes from the definition of "covered company" any company that operates an application "whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews."  § 2(g)(2)(B); see Brief for Petitioners in No. 24–656, pp. 26–27 (Brief for TikTok); Brief for Petitioners in No. 24–657, p. 26 (Brief for Creator Petitioners).  We need not decide whether that exclusion is content based.  The question before the Court is whether the Act violates the First Amendment *as applied to petitioners*.  To answer that question, we look to the pro-

visions of the Act that give rise to the effective TikTok ban that petitioners argue burdens their First Amendment rights. The exclusion for certain review platforms, however, applies only to the general framework for designating applications controlled by "covered compan[ies]," not to the TikTok-specific designation. §§ 2(g)(3)(A)–(B). As such, the exclusion is not within the scope of petitioners' as-applied challenge.

b

The Government also supports the challenged provisions with a content-neutral justification: preventing China from collecting vast amounts of sensitive data from 170 million U. S. TikTok users. 2 App. 628. That rationale is decidedly content agnostic. It neither references the content of speech on TikTok nor reflects disagreement with the message such speech conveys. Cf. *Ward*, 491 U. S., at 792–793 (holding noise control and sound quality justifications behind city sound amplification guideline were content neutral).

Because the data collection justification reflects a "purpos[e] unrelated to the content of expression," it is content neutral. *Id.*, at 791.

2

The Act's TikTok-specific distinctions, moreover, do not trigger strict scrutiny. See Brief for TikTok 26–27; Brief for Creator Petitioners 24–26. It is true that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310, 340 (2010). For that reason, "[r]egulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns." *Turner I*, 512 U. S., at 659. But while "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference," *id.*, at 658, such

Per Curiam

scrutiny "is unwarranted when the differential treatment is 'justified by some special characteristic of' the particular [speaker] being regulated," *id.*, at 660–661 (quoting *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 585 (1983)).

For the reasons we have explained, requiring divestiture for the purpose of preventing a foreign adversary from accessing the sensitive data of 170 million U. S. TikTok users is not "a subtle means of exercising a content preference." *Turner I*, 512 U. S., at 645. The prohibitions, TikTok-specific designation, and divestiture requirement regulate TikTok based on a content-neutral data collection interest. And TikTok has special characteristics—a foreign adversary's ability to leverage its control over the platform to collect vast amounts of personal data from 170 million U. S. users—that justify this differential treatment. "[S]peaker distinctions of this nature are not presumed invalid under the First Amendment." *Ibid.*

While we find that differential treatment was justified here, however, we emphasize the inherent narrowness of our holding. Data collection and analysis is a common practice in this digital age. But TikTok's scale and susceptibility to foreign adversary control, together with the vast swaths of sensitive data the platform collects, justify differential treatment to address the Government's national security concerns. A law targeting any other speaker would by necessity entail a distinct inquiry and separate considerations.

On this understanding, we cannot accept petitioners' call for strict scrutiny. No more than intermediate scrutiny is in order.

C

As applied to petitioners, the Act satisfies intermediate scrutiny. The challenged provisions further an important Government interest unrelated to the suppression of free ex-

pression and do not burden substantially more speech than necessary to further that interest.[3]

## 1

The Act's prohibitions and divestiture requirement are designed to prevent China—a designated foreign adversary—from leveraging its control over ByteDance Ltd. to capture the personal data of U. S. TikTok users. This objective qualifies as an important Government interest under intermediate scrutiny.

Petitioners do not dispute that the Government has an important and well-grounded interest in preventing China from collecting the personal data of tens of millions of U. S. TikTok users. Nor could they. The platform collects extensive personal information from and about its users. See H. R. Rep., at 3 (Public reporting has suggested that TikTok's "data collection practices extend to age, phone number, precise location, internet address, device used, phone contacts, social network connections, the content of private messages sent through the application, and videos watched."); 1 App. 241 (Draft National Security Agreement noting that TikTok collects user data, user content, behavioral data (including "keystroke patterns and rhythms"), and device and network data (including device contacts and calendars)). If, for example, a user allows TikTok access to the user's phone contact list to connect with others on the platform, TikTok can access "any data stored in the user's contact list," including names, contact information, contact photos, job titles, and notes. 2 App. 659. Access to such detailed information about U. S. users, the Government worries, may enable "China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage." 3 CFR 412. And Chinese law enables China to require companies to surren-

---

[3] Our holding and analysis are based on the public record, without reference to the classified evidence the Government filed below.

Per Curiam

der data to the government, "making companies head-
quartered there an espionage tool" of China. H. R. Rep.,
at 4.

Rather than meaningfully dispute the scope of the data
TikTok collects or the ends to which it may be used, petition-
ers contest probability, asserting that it is "unlikely" that
China would "compel TikTok to turn over user data for
intelligence-gathering purposes, since China has more effec-
tive and efficient means of obtaining relevant information."
Brief for TikTok 50 (internal quotation marks omitted). In
reviewing the constitutionality of the Act, however, we
"must accord substantial deference to the predictive judg-
ments of Congress." *Turner I*, 512 U. S., at 665 (opinion of
Kennedy, J.). "Sound policymaking often requires legisla-
tors to forecast future events and to anticipate the likely im-
pact of these events based on deductions and inferences for
which complete empirical support may be unavailable."
*Ibid.* Here, the Government's TikTok-related data collec-
tion concerns do not exist in isolation. The record reflects
that China "has engaged in extensive and years-long efforts
to accumulate structured datasets, in particular on U. S. per-
sons, to support its intelligence and counterintelligence oper-
ations." 2 App. 634.

Even if China has not yet leveraged its relationship with
ByteDance Ltd. to access U. S. TikTok users' data, petition-
ers offer no basis for concluding that the Government's de-
termination that China might do so is not at least a "reason-
able inferenc[e] based on substantial evidence." *Turner II*,
520 U. S., at 195. We are mindful that this law arises in a
context in which "national security and foreign policy con-
cerns arise in connection with efforts to confront evolving
threats in an area where information can be difficult to ob-
tain and the impact of certain conduct difficult to assess."
*Humanitarian Law Project*, 561 U. S., at 34. We thus af-
ford the Government's "informed judgment" substantial re-
spect here. *Ibid.*

Petitioners further argue that the Act is underinclusive as to the Government's data protection concern, raising doubts as to whether the Government is actually pursuing that interest. In particular, petitioners argue that the Act's focus on applications with user-generated and user-shared content, along with its exclusion for certain review platforms, exempts from regulation applications that are "as capable as TikTok of collecting Americans' data." Brief for TikTok 43; see Brief for Creator Petitioners 48–49. But "the First Amendment imposes no freestanding underinclusiveness limitation," and the Government "need not address all aspects of a problem in one fell swoop." *Williams-Yulee* v. *Florida Bar*, 575 U. S. 433, 449 (2015) (internal quotation marks omitted). Furthermore, as we have already concluded, the Government had good reason to single out TikTok for special treatment. Contrast *Brown* v. *Entertainment Merchants Assn.*, 564 U. S. 786, 802 (2011) (singling out purveyors of video games for disfavored treatment without a persuasive reason "raise[d] serious doubts about whether the government [wa]s in fact pursuing the interest it invoke[d], rather than disfavoring a particular speaker or viewpoint"). On this record, Congress was justified in specifically addressing its TikTok-related national security concerns.

2

As applied to petitioners, the Act is sufficiently tailored to address the Government's interest in preventing a foreign adversary from collecting vast swaths of sensitive data about the 170 million U. S. persons who use TikTok. To survive intermediate scrutiny, "a regulation need not be the least speech-restrictive means of advancing the Government's interests." *Turner I*, 512 U. S., at 662. Rather, the standard "is satisfied 'so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation'" and does not "burden substantially more speech than is necessary" to further that interest.

Per Curiam

*Ward*, 491 U. S., at 799 (quoting *United States* v. *Albertini*, 472 U. S. 675, 689 (1985); alterations omitted).

The challenged provisions meet this standard. The provisions clearly serve the Government's data collection interest "in a direct and effective way." *Ward*, 491 U. S., at 800. The prohibitions account for the fact that, absent a qualified divestiture, TikTok's very operation in the United States implicates the Government's data collection concerns, while the requirements that make a divestiture "qualified" ensure that those concerns are addressed before TikTok resumes U. S. operations. Neither the prohibitions nor the divestiture requirement, moreover, is "substantially broader than necessary to achieve" this national security objective. *Ibid.* Rather than ban TikTok outright, the Act imposes a conditional ban. The prohibitions prevent China from gathering data from U. S. TikTok users unless and until a qualified divestiture severs China's control.

Petitioners parade a series of alternatives—disclosure requirements, data sharing restrictions, the proposed national security agreement, the general designation provision—that they assert would address the Government's data collection interest in equal measure to a conditional TikTok ban. Those alternatives do not alter our tailoring analysis.

Petitioners' proposed alternatives ignore the "latitude" we afford the Government to design regulatory solutions to address content-neutral interests. *Turner II*, 520 U. S., at 213. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U. S., at 800; see *ibid.* (regulation valid despite availability of less restrictive "alternative regulatory methods"); *Albertini*, 472 U. S., at 689; *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 299 (1984); *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S.

789, 815–816 (1984).    For the reasons we have explained, the challenged provisions are "not substantially broader than necessary" to address the Government's data collection concerns.    *Ward*, 491 U. S., at 800.    Nor did the Government ignore less restrictive approaches already proven effective. Contrast *McCullen* v. *Coakley*, 573 U. S. 464, 490–494 (2014) (state law burdened substantially more speech than necessary where State had not considered less restrictive measures successfully adopted by other jurisdictions).    The validity of the challenged provisions does not turn on whether we agree with the Government's conclusion that its chosen regulatory path is best or "most appropriate."    *Albertini*, 472 U. S., at 689.    "We cannot displace [the Government's] judgment respecting content-neutral regulations with our own, so long as its policy is grounded on reasonable factual findings supported by evidence that is substantial for a legislative determination."    *Turner II*, 520 U. S., at 224.    Those requirements are met here.

D

In addition to the data collection concerns addressed above, the Government asserts an interest in preventing a foreign adversary from having control over the recommendation algorithm that runs a widely used U. S. communications platform, and from being able to wield that control to alter the content on the platform in an undetectable manner.    See 2 App. 628.    In petitioners' view, that rationale is a content-based justification that "taint[s]" the Government's data collection interest and triggers strict scrutiny.    Brief for Tik-Tok 41.

Petitioners have not pointed to any case in which this Court has assessed the appropriate level of First Amendment scrutiny for an Act of Congress justified on both content-neutral and content-based grounds.    They assert, however, that the challenged provisions are subject to—and fail—strict scrutiny because Congress would not have passed

Per Curiam

the provisions absent the foreign adversary control rationale. See *id.*, at 41–42; Brief for Creator Petitioners 47–50. We need not determine the proper standard for mixed-justification cases or decide whether the Government's foreign adversary control justification is content neutral. Even assuming that rationale turns on content, petitioners' argument fails under the counterfactual analysis they propose: The record before us adequately supports the conclusion that Congress would have passed the challenged provisions based on the data collection justification alone.

To start, the House Report focuses overwhelmingly on the Government's data collection concerns, noting the "breadth" of TikTok's data collection, "the difficulty in assessing precisely which categories of data" the platform collects, the "tight interlinkages" between TikTok and the Chinese Government, and the Chinese Government's ability to "coerc[e]" companies in China to "provid[e] data." H. R. Rep., at 3; see *id.*, at 5–12 (recounting a five-year record of Government actions raising and attempting to address those very concerns). Indeed, it does not appear that any legislator disputed the national security risks associated with TikTok's data collection practices, and nothing in the legislative record suggests that data collection was anything but an overriding congressional concern. We are especially wary of parsing Congress's motives on this record with regard to an Act passed with striking bipartisan support. See 170 Cong. Rec. H1170 (Mar. 13, 2024) (352–65); 170 Cong. Rec. S2992 (Apr. 23, 2024) (79–18).

Petitioners assert that the text of the Act itself undermines this conclusion. In particular, they argue that the Government's data collection rationale cannot justify the requirement that a qualified divestiture preclude "any operational relationship" that allows for "cooperation with respect to the operation of a content recommendation algorithm or an agreement with respect to data sharing." § 2(g)(6)(B); see Brief for Creator Petitioners 48–49. We disagree. The

Government has explained that ByteDance Ltd. uses the data it collects to train the TikTok recommendation algorithm, which is developed and maintained in China. According to the Government, ByteDance Ltd. has previously declined to agree to stop collecting U. S. user data or sending that data to China to train the algorithm. See 2 App. 705–706. The Government has further noted the difficulties associated with monitoring data sharing between ByteDance Ltd. and TikTok Inc. See *id.*, at 692–697. Under these circumstances, we find the Government's data collection justification sufficient to sustain the challenged provisions.

\* \* \*

There is no doubt that, for more than 170 million Americans, TikTok offers a distinctive and expansive outlet for expression, means of engagement, and source of community. But Congress has determined that divestiture is necessary to address its well-supported national security concerns regarding TikTok's data collection practices and relationship with a foreign adversary. For the foregoing reasons, we conclude that the challenged provisions do not violate petitioners' First Amendment rights.

The judgment of the United States Court of Appeals for the District of Columbia Circuit is affirmed.

*It is so ordered.*

JUSTICE SOTOMAYOR, concurring in part and concurring in the judgment.

I join all but Part II–A of the Court's *per curiam* opinion. I see no reason to assume without deciding that the Act implicates the First Amendment because our precedent leaves no doubt that it does.

TikTok engages in expressive activity by "compiling and curating" material on its platform. *Moody* v. *NetChoice, LLC*, 603 U. S. 707, 731 (2024). Laws that "impose a disproportionate burden" upon those engaged in expressive activ-

ity are subject to heightened scrutiny under the First Amendment. *Arcara* v. *Cloud Books, Inc.*, 478 U. S. 697, 704 (1986); see *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 581–585 (1983). The challenged Act plainly imposes such a burden: It bars any entity from distributing TikTok's speech in the United States, unless TikTok undergoes a qualified divestiture. The Act, moreover, effectively prohibits TikTok from collaborating with certain entities regarding its "content recommendation algorithm" even following a qualified divestiture. §2(g)(6)(B), 138 Stat. 959. And the Act implicates content creators' "right to associate" with their preferred publisher "for the purpose of speaking." *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 68 (2006). That, too, calls for First Amendment scrutiny.

As to the remainder of the *per curiam* opinion, I agree that the Act survives petitioners' First Amendment challenge.

JUSTICE GORSUCH, concurring in the judgment.

We have had a fortnight to resolve, finally and on the merits, a major First Amendment dispute affecting more than 170 million Americans. Briefing finished on January 3, argument took place on January 10, and our opinions issue on January 17, 2025. Given those conditions, I can sketch out only a few, and admittedly tentative, observations.

First, the Court rightly refrains from endorsing the government's asserted interest in preventing "the covert manipulation of content" as a justification for the law before us. Brief for Respondent 37. One man's "covert content manipulation" is another's "editorial discretion." Journalists, publishers, and speakers of all kinds routinely make less-than-transparent judgments about what stories to tell and how to tell them. Without question, the First Amendment has much to say about the right to make those choices. It makes no difference that Americans (like TikTok Inc. and many of

its users) may wish to make decisions about what they say in concert with a foreign adversary. "Those who won our independence" knew the vital importance of the "freedom to think as you will and to speak as you think," as well as the dangers that come with repressing the free flow of ideas. *Whitney* v. *California*, 274 U. S. 357, 375 (1927) (Brandeis, J., concurring). They knew, too, that except in the most extreme situations, "the fitting remedy for evil counsels is good ones." *Ibid.* Too often in recent years, the government has sought to censor disfavored speech online, as if the internet were somehow exempt from the full sweep of the First Amendment. See, *e. g.*, *Murthy* v. *Missouri*, 603 U. S. 43, 76–78 (2024) (ALITO, J., dissenting). But even as times and technologies change, "the principle of the right to free speech is always the same." *Abrams* v. *United States*, 250 U. S. 616, 628 (1919) (Holmes, J., dissenting).

Second, I am pleased that the Court declines to consider the classified evidence the government has submitted to us but shielded from petitioners and their counsel. *Ante*, at 74, n. 3. Efforts to inject secret evidence into judicial proceedings present obvious constitutional concerns. Usually, "the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene* v. *McElroy*, 360 U. S. 474, 496 (1959). Maybe there is a way to handle classified evidence that would afford a similar opportunity in cases like these. Maybe, too, Congress or even the Standing Committee on Rules of Practice and Procedure would profit from considering the question. Cf. *United States* v. *Zubaydah*, 595 U. S. 195, 245 (2022) (GORSUCH, J., dissenting). But as the Court recognizes, we have no business considering the government's secret evidence here.

Third, I harbor serious reservations about whether the law before us is "content neutral" and thus escapes "strict scrutiny." See *ante*, at 70–73; Brief for Petitioners in No. 24–

656, pp. 25–31; Brief for Petitioners in No. 24–657, pp. 24–26; Reply Brief in No. 24–656, pp. 10–12; Reply Brief in No. 24–657, pp. 8–11. More than that, while I do not doubt that the various "tiers of scrutiny" discussed in our case law—"rational basis, strict scrutiny, something(s) in between"—can help focus our analysis, I worry that litigation over them can sometimes take on a life of its own and do more to obscure than to clarify the ultimate constitutional questions. *Riddle* v. *Hickenlooper*, 742 F. 3d 922, 932 (CA10 2014) (Gorsuch, J., concurring).

Fourth, whatever the appropriate tier of scrutiny, I am persuaded that the law before us seeks to serve a compelling interest: preventing a foreign country, designated by Congress and the President as an adversary of our Nation, from harvesting vast troves of personal information about tens of millions of Americans. The record before us establishes that TikTok mines data both from TikTok users and about millions of others who do not consent to share their information. 2 App. 659. According to the Federal Bureau of Investigation, TikTok can access "*any data*" stored in a consenting user's "contact list"—including names, photos, and other personal information about unconsenting third parties. *Ibid.* (emphasis added). And because the record shows that the People's Republic of China (PRC) can require TikTok's parent company "to cooperate with [its] efforts to obtain personal data," there is little to stop all that information from ending up in the hands of a designated foreign adversary. *Id.*, at 696; see *id.*, at 673–676; *ante,* at 63–64. The PRC may then use that information to "build dossiers . . . for blackmail," "conduct corporate espionage," or advance intelligence operations. 1 App. 215; see 2 App. 659. To be sure, assessing exactly what a foreign adversary may do in the future implicates "delicate" and "complex" judgments about foreign affairs and requires "large elements of prophecy." *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*,

333 U. S. 103, 111 (1948) (Jackson, J., for the Court). But the record the government has amassed in these cases after years of study supplies compelling reason for concern.

Finally, the law before us also appears appropriately tailored to the problem it seeks to address. Without doubt, the remedy Congress and the President chose here is dramatic. The law may require TikTok's parent company to divest or (effectively) shutter its U. S. operations. But before seeking to impose that remedy, the coordinate branches spent years in negotiations with TikTok exploring alternatives and ultimately found them wanting. *Ante,* at 65. And from what I can glean from the record, that judgment was well founded.

Consider some of the alternatives. Start with our usual and preferred remedy under the First Amendment: more speech. *Supra*, at 82. However helpful that might be, the record shows that warning users of the risks associated with giving their data to a foreign-adversary-controlled application would do nothing to protect nonusers' data. 2 App. 659–660; *supra*, at 83. Forbidding TikTok's domestic operations from sending sensitive data abroad might seem another option. But even if Congress were to impose serious criminal penalties on domestic TikTok employees who violate a data-sharing ban, the record suggests that would do little to deter the PRC from exploiting TikTok to steal Americans' data. See 1 App. 214 (noting threats from "malicious code, backdoor vulnerabilities, surreptitious surveillance, and other problematic activities tied to source code development" in the PRC); 2 App. 702 ("[A]gents of the PRC would not fear monetary or criminal penalties in the United States"). The record also indicates that the "size" and "complexity" of TikTok's "underlying software" may make it impossible for law enforcement to detect violations. *Id.*, at 688–689; see also *id.*, at 662. Even setting all these challenges aside, any new compliance regime could raise separate constitutional concerns—for instance, by requiring the government to surveil Americans' data to ensure that it isn't illicitly flowing

GORSUCH, J., concurring in judgment

overseas.  *Id.*, at 687 (suggesting that effective enforcement of a data-export ban might involve "direct U. S. government monitoring" of the "flow of U. S. user data").

Whether this law will succeed in achieving its ends, I do not know.  A determined foreign adversary may just seek to replace one lost surveillance application with another.  As time passes and threats evolve, less dramatic and more effective solutions may emerge.  Even what might happen next to TikTok remains unclear.  See Tr. of Oral Arg. 146–147.  But the question we face today is not the law's wisdom, only its constitutionality.  Given just a handful of days after oral argument to issue an opinion, I cannot profess the kind of certainty I would like to have about the arguments and record before us.  All I can say is that, at this time and under these constraints, the problem appears real and the response to it not unconstitutional.  As persuaded as I am of the wisdom of Justice Brandeis in *Whitney* and Justice Holmes in *Abrams*, their cases are not ours.  See *supra*, at 82.  Speaking with and in favor of a foreign adversary is one thing.  Allowing a foreign adversary to spy on Americans is another.

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 56, line 2 from bottom: "the" before "petitioners" is deleted
p. 57, line 14 from bottom: "this case" is changed to "these cases"
p. 67, line 4: "the" before "petitioners" is deleted