

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00479-CR

_____

JOSHUA PAUL KNIGHT, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1773154

---

Before Sudderth, C.J.; Birdwell and Bassel, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant Joshua Paul Knight appeals his conviction for stalking. *See* Tex. Penal Code Ann. § 42.072. In one point, he argues that the stalking statute by which he was prosecuted and punished is unconstitutional as applied to him. We disagree, and we affirm his conviction.

## I. Background

Around Christmas Day in 2020, Knight parked a vehicle[1] on a service road at DFW Airport. The vehicle was blocking a lane of traffic, and an officer with the DFW Airport Police Department had to swerve to avoid hitting it. The officer called for the vehicle to be towed, and an employee from Euless B&B Wrecker—a company owned by the complainant, Debi Chesney, and her husband—responded and towed the vehicle.

Knight never paid the towing fee to get the vehicle out of B&B's impound lot. He did, however, attempt to retrieve his personal items from the vehicle. At the end of March 2021, Knight went to B&B and "caus[ed] a disturbance" while demanding his personal items from the vehicle. A Euless Police Officer arrived and met Knight in the parking lot, and a B&B employee told the officer that there had been ongoing issues with Knight. Specifically, the employee stated that Knight had been harassing B&B employees, Debi, and her husband and that there was pending civil litigation.

---

[1]Although he had been driving it, Knight was not the registered owner of the vehicle.

2

Knight was asked to leave, and he was subsequently issued a criminal trespass warning at the request of Debi's husband.

Knight claimed—and continues to claim—that the vehicle had been "illegally towed," so he began "a two-year saga of approximately 200 emails, civil lawsuits[,] and formal complaints." He filed numerous pro se civil lawsuits against DFW Airport, B&B, Debi, and her husband. Each lawsuit was ultimately dismissed, and Knight was declared a vexatious litigant. He also filed (1) complaints with the State Bar of Texas against the attorney who represented B&B and Debi in Knight's lawsuits against them and (2) complaints against B&B and Debi with the Better Business Bureau and regulatory towing agencies.

From January 2021 until February 2023, Knight sent several "harassing" emails to Debi, B&B employees, DFW Airport employees, officers at the DFW Airport Police Department, and the attorneys who represented these individuals. The emails eventually took on a "threatening nature" as the "vitriol in them" began to pick up. The frequency of the emails picked up over time as well; Debi received eight to ten emails from Knight per day, several of which included personal attacks against her.

Knight also contacted Debi by phone. He called Debi and the dispatch employee at B&B several times. He also called Debi's attorney both at the attorneys office and at his home number; he recorded himself doing this and then posted the video to YouTube. Knight thought that doing so would be "funny."

On two separate occasions, Debi's attorney told Knight to stop contacting Debi, but the communications did not stop. Debi's attorney even sent a cease-and-desist letter to Knight instructing him to stop contacting Debi, but he continued to contact her.

At one point, Knight told Debi's attorney and DFW Airport's attorney—in emails that were also sent to Debi—that he had installed software and was "tracking" their email activity to see when and how many times they opened and ignored his emails.

In an email that particularly "scared" Debi, Knight sent her and several other recipients—including her attorney, individuals with DFW Airport and its attorneys, local businesses and churches, local police departments, various local news stations, and other unknown individuals—a picture of her and her husband and a picture of the front of her house. He told Debi, "I know where you live." He told the other recipients of this email, "Enjoy saying hi to her around town." This made Debi fear for her life and the lives of her family members.

Detective Marc Bollon with the DFW Airport Police Department eventually received the case and began investigating Knight's harassing emails. He determined that Knight had committed the offenses of harassment and stalking and that Debi was the victim.

Knight was indicted for both stalking and harassment. The jury found him guilty of stalking and acquitted him on the harassment charge. The trial court

4

rendered its judgment on the jury's verdict and assessed his punishment at eight years' confinement.

Following his conviction, Knight filed a motion for new trial asserting, among other things, that the stalking statute by which he was convicted is unconstitutional, both facially and as applied to him. The trial court denied the motion without a hearing.

Knight timely appealed his conviction.

## II. Preservation of Error

Before we turn to the merits, we must first address whether Knight has preserved for appellate review his as-applied constitutional challenge to the stalking statute. *See* Tex. R. App. P. 33.1. The State contends that Knight failed to preserve error. We disagree.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). Further, the party must obtain an express or implicit adverse trial-court ruling or object to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020). The complaint made on appeal must comport with the complaint made in the trial court or the error is forfeited. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012).

5

On appeal, Knight argues that the stalking statute was applied "in a manner that regulated [his] speech based on its content." Thus, according to Knight, as applied to him, the statute is "a content-based restriction on [his] freedom of speech [and is] not narrowly tailored to serve a compelling state interest." This argument comports with the argument he raised in the trial court. *See id.*

In his motion for new trial, Knight argued that the stalking statute is "unconstitutional, both facially and as-applied," because "it violates freedom of speech under the First Amendment to the U.S. Constitution and Article I, [Sections] 8 and 27 of the Texas Constitution." The State asserts, without any supporting legal authority, that this "boilerplate" contention failed to preserve the "specific argument" that Knight raises on appeal—that he was "convicted for speech alone."

Contrary to the State's assertion, Knight's motion for new trial explicitly (1) raised an as-applied challenge, (2) argued that the statute violates the freedom of speech, and (3) cited the First Amendment. The motion thus sufficiently preserved Knight's as-applied challenge to the stalking statute. *See Faust v. State*, 491 S.W.3d 733, 741, 744 n.28 (Tex. Crim. App. 2015) (holding that appellants' constitutional as-applied challenge was preserved via their motion for judgment, which they raised at trial after the parties rested, challenging "the arrest and prosecution under this law, as applied to these facts"); *Gillenwaters v. State*, 205 S.W.3d 534, 537–38 (Tex. Crim. App. 2006) (holding that, while appellant's motion for new trial asserted only a general as-applied challenge and the word "vague" appeared nowhere in the motion, the motion,

6

in context, sufficiently preserved "unconstitutionally vague as applied" challenge to statute); *cf. In re A.K.*, No. 02-20-00410-CV, 2021 WL 1803774, at \*14 n.10 (Tex. App.—Fort Worth May 6, 2021, pet. denied) (mem. op.) (holding that motion for new trial preserved as-applied challenge in juvenile transfer appeal).

### III. As-Applied Challenge

Knight argues that the stalking statute, as applied to him, violates the First Amendment by prosecuting and punishing him for the "unsavory" content of his emails. He contends that they "d[o] not fall into a historically unprotected category of speech" and that "there [are] no compelling state interests justifying the speech limitation."

In response, the State argues (1) in light of the statutory elements of stalking as explained in the trial court's charge, the jury implicitly found that Knight was guilty based on his conduct, not his speech, and (2) even if Knight had been convicted for the content of his emails, they fall into the "true threats" category of historically unprotected speech.

### A. Standard of Review

We review de novo a challenge to the constitutionality of a criminal statute. *Vandyke v. State*, 538 S.W.3d 561, 570 (Tex. Crim. App. 2017). In our review, we presume that the statute is valid and that the legislature acted reasonably when enacting it. *Faust*, 491 S.W.3d at743–44. The party challenging the statute bears the

7

"heavy burden" of establishing its unconstitutionality. *Estes v. State*, 546 S.W.3d 691, 698 (Tex. Crim. App. 2018); *Vandyke*, 538 S.W.3d at 570–71.

An as-applied challenge to the constitutionality of a statute asserts that the statute, although generally constitutional, is unconstitutional as applied to the challenger's particular facts and circumstances. *Faust*, 491 S.W.3d at 743; *Ex Parte Shires*, 508 S.W.3d 856, 861 (Tex. App.—Fort Worth 2016, no pet.). The challenger must show that the statute was unconstitutionally applied to him. *Schlittler v. State*, 488 S.W.3d 306, 313–14 (Tex. Crim. App. 2016). "[T]hat it may be unconstitutional as to others is not sufficient." *State ex rel. Lykos*, 330 S.W.3d 904, 910, 916 (Tex. Crim. App. 2011) (orig. proceeding)

**B. The Stalking Statute**

The stalking statute outlaws two types of stalking: (1) stalking by harassment and (2) stalking by threats. Tex. Penal Code Ann. § 42.072(a)(1); *Ex parte Santee*, No. 03-23-00772-CR, 2025 WL 3180243, at *2 (Tex. App.—Austin Nov. 14, 2025, no pet.) (mem. op., not designated for publication); *see Bevers v. Mabry*, No. 05-22-00713-CV, 2024 WL 469550, at *7 (Tex. App.—Dallas Feb. 7, 2024, pet. denied) (mem. op.) (describing statutory elements of stalking in protective-order case). Under the stalking statute, a person commits the offense of stalking

> if the person, on more than one occasion and pursuant to the same scheme or course of conduct that is directed at a specific other person, knowingly engages in conduct that:

(1) constitutes an offense under Section 42.07 [Harassment], or that the actor knows or reasonably should know the other person will regard as threatening:

(A) bodily injury or death for the other person; or

(B) that an offense will be committed against:

(i) a member of the other person's family or household;

(ii) an individual with whom the other person has a dating relationship; or

(iii) the other person's property;

(2) causes the other person, a member of the other person's family or household, or an individual with whom the other person has a dating relationship:

(A) to be placed in fear of bodily injury or death or in fear that an offense will be committed against the other person, a member of the other person's family or household, or an individual with whom the other person has a dating relationship, or the other person's property; or

(B) to feel harassed, terrified, intimidated, annoyed, alarmed, abused, tormented, embarrassed, or offended; and

(3) would cause a reasonable person under circumstances similar to the circumstances of the other person to:

(A) fear bodily injury or death for the person;

(B) fear that an offense will be committed against a member of the person's family or household or an individual with whom the person has a dating relationship;

(C) fear that an offense will be committed against the person's property; or

(D) feel harassed, terrified, intimidated, annoyed, alarmed, abused, tormented, embarrassed, or offended.

Tex. Penal Code Ann. § 42.072(a).

> As relevant here, a person commits the offense of harassment

> if, with intent to harass, annoy, alarm, abuse, torment, or embarrass another, the person:

> > . . . .

> > (2) threatens, in a manner reasonably likely to alarm the person receiving the threat, to inflict bodily injury on the person or to commit a felony against the person, a member of the person's family or household, or the person's property; [or]

> > . . . .

> > (7) sends repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another[.]

*Id.* § 42.07(a)(2), (7). "Electronic communication" includes communication via email, instant message, network call, cellular or other type of telephone, a computer, a camera, text message, social media platform or application, the Internet, facsimile, or pager. *Id.* § 42.07(b)(1-a).

Here, the indictment alleged that Knight had committed the offense of stalking as follows:

> Knight, hereinafter called defendant, on or about the 11th day of August 2021 - 7th day of February 2023, . . . knowingly engage[d] in conduct on more than one occasion, and pursuant to the same scheme or course of conduct that was directed specifically at another person, namely, Debi Chesney and such conduct constitutes harassment or defendant knew or should reasonably have known that Debi Chesney would regard such conduct as threatening bodily injury or death for Debi Chesney or a member of Debi Chesney's family, household, or a person with whom Debi Chesney has a dating relationship,

10

and such conduct did cause Debi Chesney to be placed in fear of bodily injury or death for Debi Chesney or a member of Debi Chesney['s] household, or a person with whom Debi Chesney has a dating relationship, or did cause Debi Chesney to feel harassed, annoyed, alarmed, abused, or tormented,

and such conduct would cause a reasonable person to fear bodily injury or death to herself or a member of her family, household, or a person with whom she had a dating relationship, or to fear that an offense would be committed against her property or to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended, and such conduct is as follows: The defendant sent repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend Debi Chesney, or by threatening in a manner reasonably likely to alarm Debi Chesney, to inflict bodily injury on the person or to commit a felony against the person, a member of the person's family or household, or the person's property on or about the 29th day of September 2022 and on or about the 30th day of December 2022.

## C. *Owens v. State*

Knight relies on *Owens v. State*, No. PD-0075-24, 2025 WL 1587690, at \*1 (Tex. Crim. App. June 4, 2025) to support his as-applied challenge to the stalking statute. In *Owens*, the Court of Criminal Appeals (CCA) analyzed an as-applied challenge to the electronic-harassment statute, *see* Tex. Penal Code Ann. § 42.07(a)(7), and held that as applied to Owens, the statute was an unconstitutional content-based restriction on his speech. 2025 WL 1587690, at \*1, \*9.

Owens was convicted of harassment for sending thirty-four electronic messages—emails, texts, and one Facebook message—to his former therapist over a fifteen-week period. *Id.* at \*4, \*7. All the messages, including their content, were

11

admitted at Owens's trial over his First Amendment objection. *Id.* On appeal, Owens challenged the constitutionality of the electronic-harassment statute as applied to him and argued that he had been punished for the content of his messages. *Id.* at *6.

In its opinion, the CCA provided an overview of the First Amendment and content-based laws:

> The First Amendment generally prohibits the government from prohibiting speech or expressive conduct. *R.A.V. v. St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, [2542] (1992). . . . The government cannot restrict expression because of its message, ideas, subject matter[,] or content. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790–91, 131 S. Ct. 2729, [2733] (2011) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, [573,] 122 S. Ct. 1700, [1707] (2002)).
>
> . . . .
>
> Content-based laws target speech based on its communicative content. *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 135 S. Ct. 2218, [2226] (2015). . . . If it is necessary to look at the content of the speech to decide if the speaker violated the law, the regulation is content based. *Ex parte Nuncio*, 662 S.W.3d 903, 917 (Tex. Crim. App. 2022) (citing *Ex parte Thompson*, 442 S.W.3d 325, 345 (Tex. Crim. App. 2014), and *Ex parte Lo*, 424 S.W.3d 10, 15 n.12 (Tex. Crim. App. 2013)).
>
> . . . .
>
> Prosecution based on the content of a message is permitted only in very limited circumstances. If a statute is content based, it must meet strict scrutiny; the statute is presumptively unconstitutional and may be justified only if the government proves that it is narrowly tailored to serve compelling state interests. *TikTok*[ *Inc. v. Garland*], [604 U.S. 56,] 145 S. Ct. [57,] 67 [(2025)] (quoting *Reed*, 576 U.S. at 163, 135 S. Ct. [at 2226]).
>
> . . . .

If a content-neutral statute is applied in a manner that regulates speech based on its content, it must meet strict scrutiny to survive a First Amendment challenge.

. . . .

The government may prohibit the intrusion into the home of unwelcome views and ideas that cannot be banned from public dialog. *Cohen* [*v. California*], 403 U.S. [15,] 21, 91 S. Ct. 1780[, 1786 (1971)] . . . . The government's ability to regulate speech depends on a showing that the speech invades substantial privacy interests in an essentially intolerable manner. *Id.*[, 91 S. Ct. at 1786.] . . . The right of a person to be left alone must be weighed against the right of others to communicate. *Rowan*[*v. U.S. Post Off. Dep't*], 397 U.S. [728,] 736, 90 S. Ct. 1484[, 1490 (1970)]. . . . "Nothing in the [C]onstitution compels us to listen to or view any unwanted communication" in the privacy of our own homes; we are permitted to bar solicitors, block senders of mail, or turn off a radio or television to prevent offensive communications from entering the home. [*Id.* at 737, 90 S. Ct. at 1490]

*Id.* at *1–3.

The CCA then began its analysis, "Sending messages is an act, but the messages themselves are speech, and the prosecution in this case was based on [Owens's] speech, not his action." *Id.* at *7. Section 42.07(a)(7) protects from conduct that invades a person's substantial privacy rights in an intolerable manner. *Id.* But when Section 42.07(a)(7) is used to regulate speech, as it was in Owens's case, those privacy rights "must be delicately balanced" with the First Amendment right to communicate. *Id.* The CCA concluded that the scale tipped in Owens's favor for three reasons: First, there was no "invasion into the home" because the messages were sent to the therapist's professional email and phone and to her professional social media account, not to her home or personal accounts. Second, the therapist was not a "captive

audience" or "powerless to avoid the messages"; she could have deleted the messages without reading them or blocked Owens's contact information but chose not to do so. Third, the government's ability to regulate speech "requires an invasion of *substantial* privacy rights in an *essentially intolerable manner*." The thirty-four messages that Owens sent during a three-month period to "publicly accessible, commercial accounts controlled by a willing listener [was] no such invasion." *Id.*

"Because [Owens] was prosecuted for the content of his messages, the statute's application is presumptively unconstitutional and may be justified only if the government proves its application was narrowly tailored to serve compelling state interests. The State makes no such showing here." *Id.* Thus, the CCA held that the electronic-harassment statute was unconstitutional as applied to Owens. *Id.* at *9.

## D. Analysis

Knight was convicted of stalking, not harassment. *Cf. id.* at *4 (analyzing as-applied challenge to electronic-harassment statute). Under the stalking statute, Knight could have been charged with stalking either by harassment or by threats or by both, *see* Tex. Penal Code Ann. § 42.072(a), and he was ultimately indicted for both. Based on the evidence before it, the jury could have found Knight guilty of either manner and means of stalking based on his speech or his nonspeech conduct. Thus, the stalking statute was not unconstitutionally applied to Knight.

### 1. Knight's Nonspeech Conduct

The jury heard the following evidence of Knight's nonspeech conduct:

- Knight contacted or attempted to contact Debi at least 200 times over the course of approximately two years, beginning in January 2021;

- Debi testified that Knight had sent her eight to ten emails per day;

- Knight often included B&B's dispatcher in his emails;

- Knight sent emails addressed to Debi and several other recipients—some of whom were accustomed to dealing with pro se litigants yet found Knight's conduct to be "alarming";

- Knight sent several emails—"multiple e[]mails a day"—to Debi's attorney and included Debi in "every single one of them", causing her emotional distress;

- At first, the emails were "frustrating," but as they went on, they became "harassing" and concerning;

- Debi agreed that the emails were harassing;

- Knight also called Debi and her employees at B&B;

- Knight called Debi's attorney at his office and at his home number;

- Debi's attorney asked Knight to stop contacting Debi, but he continued to contact her;

- Debi's attorney sent a cease-and-desist letter to Knight instructing him to stop contacting Debi, but he continued to contact her;

- Debi's attorney described Knight's conduct as "incessant";

- Knight testified that he had been a "nuisance" and agreed that being a nuisance long enough could make others feel like they were being "tormented"; and

- Knight testified that he had "targeted" Debi.

Despite Knight's "incessant" conduct, Debi did not contact law enforcement.

In March 2021—months after Knight's correspondence began—Debi's husband

requested a criminal trespass warning from the police after Knight physically showed up at B&B and caused a disturbance, and B&B employees told the responding officer that Knight had been "harassing" and "threatening" Debi and her husband. But it was not until 2022 that law enforcement actually began investigating this case, in part because of one of the lawsuits that Knight had filed.

Without even getting into the content of Knight's electronic communications, the jury heard evidence of Knight's sending repeated unwanted emails and making unwanted phone calls to Debi either directly or indirectly and continuing to do so after being instructed to stop. Indeed, Knight himself describes this case as "a two-year saga of approximately 200 emails, civil lawsuits[,] and formal complaints." We conclude that the jury could have found Knight guilty based on his nonspeech conduct that did not implicate the First Amendment. *See Ex parte Sanders*, 663 S.W.3d 197, 201 (Tex. Crim. App. 2022) (holding that the harassment statute is facially constitutional because it prohibits nonspeech conduct and thus does not implicate the First Amendment); *Wagner v. State*, 539 S.W.3d 298, 314–15 (Tex. Crim. App. 2018) (rejecting as-applied challenge to similar statute outlawing harassing communications in violation of protective order; appellant sent approximately sixteen text messages to the complainant in a six-day period and continued to send her messages after she told him to stop, sent her multiple lengthy emails, and called her multiple times); *Hoover v. State*, No. 03-24-00082-CR, 2025 WL 3558574, at *17 (Tex. App.—Austin Dec. 12, 2025, no pet.) (mem. op., not designated for publication) (distinguishing *Owens* and

concluding that appellant was not indicted for stalking based on the content of his communications but was indicted for the unwanted and persistent nature of them; appellant had committed threatening conduct by "sending repeated unwanted electronic messages and making repeated unwanted phone calls", *Davidson v. State*, No. 12-24-00360-CR, 2025 WL 3550581, at *14 (Tex. App.—Tyler Dec. 10, 2025, pet. filed) (mem. op., not designated for publication) (distinguishing *Owens* and holding that stalking statute was not unconstitutionally applied to appellant when she was charged with both speech and nonspeech conduct, complainant did not immediately contact law enforcement when appellant's conduct began, and appellant's conduct continued after law enforcement told her to stop); *cf. Owens*, 2025 WL 1587690, at *7 (sustaining as-applied challenge because the content of appellant's messages "drove the prosecution" instead of "[t]he manner of the communications"; complainant called the police on receipt of the first message—not after receipt of repeated messages—and was immediately disturbed by the messages' content—not merely the manner in which they were sent—and both complainant and trial judge said appellant would have "avoided prosecution" if he had at first expressed "a different tone or message").

**2. Knight's Speech**

The jury heard evidence of the content of Knight's emails—some of which was "of a threatening nature." On September 29, 2022, Knight sent an email to Debi and others stating,[2]

> Hey asshats, you're behind schedule and I haven't got anything from you . . . .
>
> . . . .
>
> You ladies need to get your shit together and, make something happen sliding me a check my way within the next 7[ ]days that[ ]makes me happy or[ ]we[ ]have issues.
>
> . . . .
>
> …I lost everything. And, i've got zero shits to give.
>
> . . . .
>
> We are done. You're slacking bullshitting and dodging responsibility.
>
> I want paid in 7 days. And it better not be insulting.
>
> . . . .
>
> Tick tock asshats.

On December 30, 2022—two years after B&B towed the vehicle—Knight told Debi and others that the

---

[2]We quote Knight's emails without correction of all the typographical or grammatical errors.

18

longer it goes on, the more likely my winnings just go to hiring a lot of P.I's to watch a LOT of peoples families with nice rewards set for anyone of them they get put into prison . . . enough and i wipe your entire family out of the gene pool.

I lost my family, why do you get to keep yours?

I lost my significant other, why do you get to keep yours?

I lost my peace of mind and all sense of safety, why do you get to keep yours?

I'm getting very very done.

. . . .

You need to decide really really fast how painful you want your loss to be.

Knight repeated these statements in another email. Detective Bollon testified that Knight's stating that he would "wip[e] someone out of the gene pool" was a threat to the email's recipients, including Debi, to "eliminate [them] from existence." Detective Bollon also perceived a threat to Debi's family in Knight's stating, "I lost my family. Why do you get to keep yours?"

In a subsequent email, Knight told Debi's attorney, "I'm not gonna drop it, not gonna let it go. I lost everything. I will destroy your entire lives over this, and I'm not making some idle crap comment or threat. You're out of time, you know you don't have shit . . . ." Detective Bollon testified that he had perceived this email as a threat as well.

Approximately two weeks later, Knight sent Debi and others the following email:

I'm sick of your sorry incompetent lying sack of shit asses.

. . . .

I'm pretty fucking done and it's actually just going to cause you a shit ton of grief for the rest of your life ever fucking minutes we aren't done with this suit and you don't make me as happy as goddamn possible.

Everyone is already going to be lucky to ever work anything ever again, or their families not just imprisoned for breathing in the wrong direction.

. . . .

And I'll start digging through some people's college connections.

Let's see who got drunk and did something stupid. Let's see how many of the narcissistic assholes have a grey rape . . . .

. . . .

I absolutely will start finding everything.

And I'm going to make sure everyone knows everything about all your worst moments . . . .

In another email sent to several people, including Debi and her attorney, Knight referred to Debi as an "old fat half witted cunt of a cum guzzling slut." In the same email, he told its recipients that they "have literally chosen to die or win by scorched fucking earth," that "[no]ne of [them] deserve at all to even be alive," and that "[n]one of [them] deserve to participate in society." He also threatened to "come

20

to [their] fucking place of work and make enough attention to draw the news." Knight warned them, "This doesn't just go away or get better[,] . . . and it's definitely not getting cheaper."

Knight claimed that he had used software to "track" his emails so that he could see when and how many times his emails had been opened and viewed by their recipients. He told Debi, her attorney, and others that he had been tracking them, which led Debi's attorney to believe that Knight had hacked into his email account. Concerned, Debi's attorney hired an IT professional to investigate Knight's claims.

In yet another email—which he sent to Debi and "a lot of [other] people," including local businesses, churches, and news stations—Knight told Debi that he had used Google to learn her home address, telling her, "I know where you live." He included in the email a picture of her and her husband and a picture of the front of her house. He also referred to Debi as a "stupid piece of shit cunt faced fake christian [sic] whore"; listed his accusations against Debi and her husband; and encouraged others in her community to take action against Debi and her husband and against B&B, stating, "Enjoy saying hi to her around town."

When asked if Knight's emails had made Debi feel offended or threatened, she stated that they had "very much so." She had never been so disrespected or felt so degraded. She was also afraid because Knight knew where she lived and worked. Debi testified that Knight's finding and sharing her home address and pictures of her and

her house to several people had scared her and that, because of Knight, she had feared for her and her family members' lives.

During his testimony, Knight acknowledged that he had "targeted" Debi and that his emails to her were "hateful." He agreed that some of the statements he had made in his emails—e.g., telling someone that he would erase them from the gene pool—could be perceived as a threat but attempted to clarify that it would depend on the "context," though he could not "a hundred percent" recall his "stream of thought." Knight also agreed that his being a nuisance "[m]aybe" could have made others feel annoyed, alarmed, and abused and that if it went on "long enough," it would make others feel tormented.

Balancing Knight's First Amendment right to communicate with Debi's privacy rights, we conclude that the scale tipped in Debi's favor because (1) Knight's conduct invaded Debi and her family's home, (2) Debi was a captive audience and could not avoid Knight's conduct, and (3) Knight's conduct invaded Debi's substantial privacy interest in an essentially intolerable manner. Specifically,

- Knight sent several threatening emails to Debi;
- he "targeted" Debi;
- he knew where Debi and her family lived and made sure she knew that;
- he had pictures of Debi, her husband, and their house;
- he disseminated Debi's home address, a picture of her house, and her and her husband's picture to several individuals, businesses, churches, and news stations near her home;

22

- he encouraged others to take action against Debi, her husband, and B&B;

- he emailed or called not only Debi but also her attorney and B&B, including B&B's employees;

- he filed multiple frivolous lawsuits against Debi and B&B;

- he filed complaints with the State Bar of Texas against Debi's attorney for his representing her and B&B;

- he filed complaints against B&B and Debi with the Better Business Bureau and regulatory agencies, and Debi and her husband "had to deal with" those complaints; and

- he continued his unwanted conduct after being instructed—at least twice—not to contact Debi.

Debi testified that she was scared and that she felt very offended and threatened by Knight's conduct. He had been able to get to Debi, not just through her email address but in other ways as well. He knew where she lived and worked. He had physically shown up to B&B twice, and one of those times resulted in a criminal trespass warning against him. Debi testified that because of Knight, she feared for her life and the lives of her family members. Indeed, Knight's conduct went beyond merely sending a few dozen messages to "publicly accessible, commercial accounts controlled by a willing listener." *See Owens*, 2025 WL 1587690, at *7; *see also Kinney v. Barnes*, 443 S.W.3d 87, 95 (Tex. 2014) (noting the "significant distinction" between violating a person's freedom of speech and penalizing their abuse of that freedom).

We conclude that, to the extent that the jury found Knight guilty based on the content of his emails, the compelling state interest in protecting citizens from speech

that invades their substantial privacy interests in the home in an essentially intolerable manner justified the statute's limitations on Knight's First Amendment rights. *See Owens*, 2025 WL 1587690, at \*3.

Further, Knight's threats to Debi are not protected speech because they fall under one of the historically unprotected categories of speech—true threats. *See Counterman v. Colorado*, 600 U.S. 66, 72, 143 S. Ct. 2106, 2113 (2023) ("True threats of violence . . . lie outside the bounds of the First Amendment's protection."); *Ex parte Lowry*, 693 S.W.3d 388, 407 (Tex. Crim. App. 2024) (listing "true threats" as a category of speech outside the protection of the First Amendment); *Webb v. State,* 991 S.W.2d 408, 415 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) ("A threat is not protected speech."). A threat is a "true threat" if it is a "serious expression[] conveying that [the] speaker means to commit an act of unlawful violence." *Counterman*, 600 U.S. at 74, 143 S. Ct. at 2114 (internal quotations omitted). This distinguishes threats from mere jests, hyperbole, or statements that in context do not convey a real possibility of violence. *Id.*, 143 S. Ct. at 2114. The existence of a threat depends on 'what the statement conveys' to the person on the other end." *Id.*, 143 S. Ct. at 2114. For a threat to be a true threat, the defendant must also have had some understanding of the threatening character of his statement. *Id.* at 73, 143 S. Ct. at 2113. For First Amendment purposes, "a recklessness standard is enough." *Id.*, 143 S. Ct. at 2113.

Speech enjoys no First Amendment protection when the speaker, at a minimum, recklessly places the recipient in fear of bodily injury or death. *See*

*Counterman*, 600 U.S. at 73, 143 S. Ct. at 2113; *Lewis v. State*, 88 S.W.3d 383, 392 (Tex. App.—Fort Worth 2002, pet. ref'd) (first citing *Long v. State,* 931 S.W.2d 285, 290 (Tex. Crim. App. 1996); and then citing *Webb,* 991 S.W.2d at 415); *see also Frieling v. State*, 67 S.W.3d 462, 473 (Tex. App.—Austin 2002, pet. ref'd) ("[S]peech is not protected by the First Amendment when it is the very vehicle of the crime itself."). Emails that are part of a scheme or course of conduct that places another in fear of bodily injury are not constitutionally protected speech. *Webb v. Schlagal*, 530 S.W.3d 793, 805 (Tex. App.—Eastland 2017, pet. denied); *see* Tex. Penal Code Ann. § 42.072(a). Here, the jury found Knight guilty of stalking, i.e., it found him guilty of acting at least knowingly, or with knowledge, which is a higher culpable mental state than recklessness. *See Counterman*, 600 U.S. at 79, 143 S. Ct. at 2117; *see also* Tex. Penal Code Ann. § 42.072(a)(1) (incorporating harassment statute); *Owens*, 2025 WL 1587690, at *3 (noting that the harassment statute has two parts: intent and repeated communications in a certain manner).

Knight argues that his threats were not true threats. He asserts that his emails must be read "in context" to understand that he was not threatening violence or harm. But in one of his emails, Knight explicitly stated that he was not making "some idle crap comment or threat." In another, he indicated an understanding or even intent to make Debi feel threatened by his statements: "I lost my peace of mind and all sense of safety. Why do you get to keep yours?" Those statements, read in context with the other threatening statements throughout his many emails, were not mere

25

jests or hyperbole: (1) he gave Debi deadlines to do as he said and threatened that there would be consequences for failing to meet the deadlines; (2) he said he was going to hire private investigators to watch Debi's family; (3) he said he was going to "wipe [Debi's] entire family out of the gene pool," asking the rhetorical question, "I lost my family. Why do you get to keep yours?"; (4) he told Debi to "decide really really fast how painful [she] want[ed her] loss to be"; (5) he told Debi that he was "going to cause [her] a shit ton of grief for the rest of [her] life" unless she "ma[d]e [him] as happy as goddamn possible"; (6) he told Debi and her attorney that they did not "deserve to even be alive" or to "participate in society"; (7) he threatened to go to Debi's place of work, which he already had, and "make enough attention to draw the news"; (8) he told Debi he knew where she lived in the same email in which he encouraged others to confront her in the community; and (9) in an email to Debi's attorney, he threatened, "I will destroy your entire lives over this." In context, these statements conveyed a real possibility of violence.

We conclude that, to the extent that the jury found Knight guilty based on the content of his emails, Knight's threatening statements were true threats that lie outside the protection of the First Amendment. *See Counterman*, 600 U.S. at 72, 143 S. Ct. at 2113; *Lowry*, 693 S.W.3d 388, 407.

We hold that the stalking statute is not unconstitutional as applied to Knight. Accordingly, we overrule his sole point.

26

## IV. Conclusion

Having overruled Knight's sole point, we affirm the trial court's judgment.[3]

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: March 12, 2026

---

[3]Throughout the pendency of this appeal, Knight has filed or attempted to file several pro se documents despite being represented by appointed appellate counsel. On December 27, 2024, Knight filed a motion to proceed pro se. We abated the appeal and remanded the case for the trial court to determine, among other things, whether Knight desired to proceed pro se. At the abatement hearing, Knight informed the trial court that he did not want to proceed pro se and that he wanted his appointed appellate counsel to continue representing him in this appeal. After we received the supplemental record from the trial court, we reinstated the appeal. Knight continued to file pro se documents.

We have sent Knight three letters informing him that we would not consider his pro se documents because there is no right to hybrid representation in this appeal, *see Turner v. State*, 805 S.W.2d 423, 425 n.1 (Tex. Crim. App. 1991), and directing him to contact his appointed appellate counsel with any questions concerning his appeal. Knight ignored our letters and continued to file pro se documents in this appeal. Because Knight has appointed counsel, we do not consider any of his pro se documents. *See Ex parte Cole*, Nos. 02-25-00345-CR, 02-25-00346-CR, 02-25-00347-CR, 2025 WL 3684296, at *1 n.1 (Tex. App.—Fort Worth Dec. 18, 2025, no pet.) (mem. op., not designated for publication) (refusing to consider appellant's pro se request because he had appointed counsel); *Pickett v. State*, No. 02-19-00090-CR, 2020 WL 2073733, at *1 n.3 (Tex. App.—Fort Worth Apr. 30, 2020, pet. ref'd) ("A defendant has no absolute right to hybrid representation; courts may ignore pro se motions filed by defendants with appointed counsel.").